UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Terrance Petrie,<br>        Plaintiff,<br><br>v.<br><br>Equifax Information Services, LLC;<br>Capital One Bank (USA), National<br>Association; and DOES 1 through 100<br>inclusive,<br><br>        Defendants. | CASE NO. 5:21-cv-00735 |

COMES NOW Plaintiff **TERRANCE PETRIE** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant Capital One Bank (USA), National Association ("Capital One") is not reporting either of Plaintiff's two accounts accurately as satisfied, as each was settled or paid in full for less than full amount.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

5. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

6. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

7. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

8. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

9. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

10. Plaintiff alleges that one of his Capital One accounts was settled, satisfied, and legally paid in full for less than the full amount in or about August of 2020, and is not a charged off debt. Capital One even acknowledged this satisfaction via a payoff letter.

11. Plaintiff alleges that a second of his Capital One accounts was settled, satisfied, and legally paid in full for less than the full amount in or about May of 2019, and is not a charged off debt.

12. Plaintiff alleges that it is patently incorrect and misleading for a debt which was settled and fully satisfied to be reported on a credit report with a payment status of charge off.

13. Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

14. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

15. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his FICO Score.

16. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

17. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

18. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

19. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

20. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

21. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

22. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

23. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

24. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

25. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

26. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

27. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

28. Each of the five (5) factors is weighted differently by FICO.

29. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

30. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

31. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

32. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

33. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

34. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." See https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See Id*.

B.   **Metro 2**

35.   The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

36.   The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner.

37.   The CDIA's Metro 2 format is the credit reporting industry standard for credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness*.

38.   The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt.

39.   The CDIA is experienced in credit reporting. In support of this allegation, Plaintiff avers the following:

   a.   The CDIA offers a FCRA certificate program for all CRAs.
   b.   The CDIA offers a FCRA awareness program for all CRAs.
   c.   The CDIA offers a FCRA certificate program for DFs.
   d.   The CDIA offers a FCRA awareness program for DFs.
   e.   The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.
   f.   The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.
   g.   The CDIA developed a credit reporting resource guide for reporting credit.

40.   The CDIA's Metro 2 format is accepted by all CRAs.

41.   The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

42.   The CRRG outlines the industry standards for reporting debts using Metro 2 format.

43.   The CRRG is not readily available to the public. It can be purchased for $229.45.

44. Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

45. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

46. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

47. If the Metro 2 data received by FICO deviates from the FCRA requirements or industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.     e-OSCAR**

48. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

49. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

50. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

51. When a data furnisher reports on a consumer's account, it sends an automated universal dataform ("AUD") to each CRA.

52. For clarification, an AUD is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**D.     Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

53. On October 14, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "October 14 Credit Reports").

54. Plaintiff noticed adverse tradelines in his October 14 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

55. Plaintiff then disputed the inaccurate tradelines regarding the Capital One accounts via certified mail to Equifax, Experian, and TransUnion on or about November 16, 2020 (the "Dispute Letters").

56. Plaintiff's Dispute Letters specifically put Capital One on notice Plaintiff paid each of the debts, they are not charged off, and that each account should be updated.

57. Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

58. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

59. Plaintiff is informed and believes that Equifax, Experian, and TransUnion each received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to Capital One, as the data furnisher, via an ACDV through e-OSCAR.

60. On July 30, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if his accounts were updated.

    **a.    Inaccuracy – Capital One**

61. Despite actual knowledge, Capital One continued to report one of Plaintiff's accounts, beginning in 517805XXXXXX ("Capital One Account #1"), to Equifax with a current payment status tradeline of "Charge-off". This is patently incorrect as this account was legally paid or settled for less than the full amount in or about August of 2020.

62. Despite actual knowledge, Capital One continued to report a second account of Plaintiff's, beginning in 543857XXXXXX ("Capital One Account #2"), to Equifax with a current payment status tradeline of "Charge-off". This is patently incorrect as this account was legally paid or settled for less than the full amount in or about May of 2019.

63. Plaintiff alleges that Capital One did not investigate whether Plaintiff previously settled and satisfied the accounts.

64. Capital One did not update the tradelines on either account to reflect that Plaintiff paid and satisfied each account.

65. Equifax, Experian, and TransUnion provided notice to Capital One that Plaintiff was disputing the inaccurate and misleading information, but Capital One failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

66. The most basic investigation would include a simple review of internal documentation on the accounts (i.e., the fact each account was settled and satisfied) compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

67. Plaintiff alleges that Capital One did not review if its reporting complied with the unambiguous language of the FCRA or regulatory guidelines on accurate reporting under the FCRA.

68. If Capital One reviewed such standards, or its own internal records regarding Plaintiff's accounts, Capital One would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

69. The term "charge-off" means an account is closed, although the debt is still owed and may be sent to collections. By continuing to report Plaintiff's accounts with a current payment status tradeline of "charge-off", it appears to third parties viewing Plaintiff's credit report that the accounts were not paid or satisfied, which is patently incorrect. In addition, as Capital One's inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

70. Charged-off debts are far more injurious to a credit score than a satisfied debt. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment statuses reported by Capital One is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

71. The lack of investigation and reporting of inaccurate and incomplete information by Capital One is unreasonable.

**E.     Damages**

72. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

73. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as

to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

74. Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Capital One.

75. Capital One's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

76. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Assure Credit Reporting Accuracy**

77. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

78. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Capital One accounts as described herein.

79. Equifax knew, or should have known, (1) that Capital One Account #1 was paid or settled for less than the full amount in or about August of 2020, (2) that Capital One Account #2 was paid or settled for less than the full amount in or about May of 2019, and (3) that neither account should not have been reported with a current payment status tradeline of "charge-off" on account of the settlement payments satisfying the debts. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

80. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

B.  **Willful Violations**

81. Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

82. Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

83. To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

84. Equifax's employees receive little to no training concerning how to accurately report consumer debt.

85. Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

86. Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

87. Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

88. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

89. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

90. In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

91. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

92. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Capital One Failed to Reinvestigate Following Plaintiff's Dispute**

93. Pursuant to 15 U.S.C. §§ 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

94. Capital One sent an AUD to the Credit Reporting Agencies reporting Plaintiff's accounts as a charge off. After Plaintiff satisfied or paid Capital One Account #1 in or about August of 2020 and satisfied or paid Capital One Account #2 in or about May of 2019, Capital One sent AUDs to TransUnion and Experian reporting the account payment statuses as paid. However, the AUDs Capital One sent to Equifax after satisfaction on each account continued to report the payment statuses at that time as a "Charge-off".

95. After receiving Dispute Letters, Capital One did not correct the payment statuses on either account. Instead Capital One verified and re-reported these inaccurate tradelines via ACDV to Equifax.

96. The payment status reported in an AUD or ACDV represents the status of the account at the time of sending the AUD or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the accounts were previously charged off, if at all, it has no bearing on the accounts' *current* pay status after each account was paid or satisfied.

97. Capital One violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

98. TransUnion, Equifax, and Experian provided notice to Capital One that Plaintiff was disputing the inaccurate and misleading information; however, Capital One either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

99. Based on Plaintiff's disputes, review of its internal records on the accounts, and how it is reporting these same accounts to Experian and TransUnion, Capital One should have known its accounts were paid or satisfied, and ceased its inaccurate reporting.

100. Reporting a paid or satisfied debt as currently charged off is patently incorrect. In addition, this inaccurate reporting also adversely affects credit decisions. Charged off debts are far more injurious to a credit score than a debt paid or satisfied. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Capital One's reporting as described herein has a direct adverse effect on Plaintiff's FICO Score and his ability to rebuild his credit score and obtain new credit.

101. The lack of investigation by Capital One, as required by the FCRA, is unreasonable.

**B. Willful Violations**

102. Plaintiff alleges that Capital One has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

103. Plaintiff further alleges that Capital One has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

104. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Capital One's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

105. In the alternative, Capital One was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**C. Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

106. Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's disputes regarding the Capital One accounts.

107. Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

108. Equifax is not a passive entity bound to report whatever information a data furnisher provides.

109. Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

110. Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

111. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

112. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that Capital One was not reporting its accounts at issue correctly.

113. Had Equifax conducted a proper investigation, it could have closed or bookended each of the Capital One debts by adding a notation on the credit report to show that the debt was in fact paid or settled for less than the full amount, and satisfied. However, Equifax continued to report each of the Capital One accounts as described herein.

114. Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

## THIRD CAUSE OF ACTION

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))**

**(Against Defendants and Does 1-100)**

115. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Equifax Failed to Review and Consider all Relevant Information**

116. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

117. Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### B. Willful Violations

118. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

119. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

120. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
### (Against Defendants and Does 1-100)

121. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

### A. Equifax Failed to Delete Disputed and Inaccurate Information

122. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

123. Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### B. Willful Violations

124. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

125. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

126. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

127. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

   f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: August 3, 2021

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

                                                **SCHUMACHER LANE PLLC**

Dated: August 3, 2021                       */s/ Kyle Schumacher*
                                                Kyle Schumacher
                                                Attorney for Plaintiff